1
2
3
4
5
6                    IN THE UNITED STATES DISTRICT COURT

7                      FOR THE DISTRICT OF ARIZONA

8

9   MICHAEL B. RATOFF,                    )
                                          )   NO.   CV 07-246-TUC-DCB (BPV)
10            Plaintiff,                   )
                                          )
11       vs.                              )   **REPORT AND RECOMMENDATION**
                                          )
12  MICHAEL J. ASTRUE, Commissioner of)
    Social Security,                      )
13                                        )
              Defendant.                  )
14  _____)

15          Plaintiff filed this action for review of the final decision of the Commissioner for

16  Social Security pursuant to 42 U.S.C. §§ 405(g).  The case has been referred to the United

17  States Magistrate Judge pursuant to the Rules of Practice of this Court.

18          Pending before the Court is a Motion for Summary Judgment filed by Plaintiff on

19  September 17, 2007 (Doc. No. 10), a Response to Plaintiff's Motion for Summary Judgment

20  (Doc. No. 19) and a Cross-Motion for Summary Judgment (Doc. No. 18) filed by Defendant

21  on December 26, 2007, and a Reply to Defendant's Opposition to Plaintiff's Motion for

22  Summary Judgment and Response to Defendant's Motion for Summary Judgment (Doc. No.

23  22), filed on January 9, 2008.  For the following reasons, the Magistrate Judge recommends

24  that the ALJ's decision be reversed and the matter remanded for an immediate award of

25  benefits.

26  **I.    PROCEDURAL HISTORY**

27          Plaintiff filed an Application for Social Security Disability Insurance Benefits

28  ("SSDIB") under Title II of the Social Security Act ("SSA") on January 26, 2005, alleging

that he had suffered from a disability since October 1, 2002.  (Transcript/Administrative Record ("Tr.") 79)  Plaintiff alleged he was disabled due to chronic recurrent depression, among other social and cognitive difficulties.  (Tr. 117)

The Social Security Administration (SSA) denied Plaintiff's Application initially, and on reconsideration.  (Tr. 50-58)  Plaintiff requested review (Tr. 46-47) and on August 25, 2006, appeared with an attorney, and testified, along with a vocational expert, at a hearing before Administrative Law Judge ("ALJ") Milan Dostal.  (Tr. 425-456)  The ALJ found Plaintiff was not disabled.  (Tr. 21-34)  Plaintiff appealed the ALJ's decision, submitting no further medical evidence. (Tr. 18-20, 395-424) The Appeals Council denied review on April 11, 2007, making the decision of the ALJ the final decision of the Commissioner[1].  (Tr. 8-10.)  *See* 20 C.F.R. §§ 404.981.  Plaintiff filed the instant Complaint in U.S. District Court appealing the Commissioner's final decision (Doc. No. 1).

**II.    THE COMMISSIONER'S DECISION AND EVIDENCE PRESENTED**

A.    Plaintiff's Education and Work History

Plaintiff was born on October 12, 1966.  (Tr. 73)  He finished high school and took some courses after high school, but never formally.  (Tr. 430)  Plaintiff's past relevant work consists of being a graphic artist for four years from 1993 to 1997 and a retail sales clerk for two years form 1998 to 2000. (Tr. 118) Plaintiff's disability insurance expired on December 31, 2004.  (Tr. 30)

B.    Plaintiff's Testimony

On August 25, 2006, Plaintiff appeared before ALJ Dostal, with an attorney representative.  (Tr. 425-456)  Exhibits 1A, 1B to 3B, 1D, 1E to 6E, and 1F to 4F were admitted into evidence.  (Tr. 427)  Plaintiff testified that the last work he did was as a clerk in a video store checking in and out videos in the children's department for more than a year, though he was uncertain of the amount of time he worked there.  (Tr. 431)  Prior to that, he

---

[1] Due to an inaccurate date stamped on the denial notice, Plaintiff was granted an extension within which to file a civil action. (Tr. 3) This filing is therefore timely.

worked in digital pre-press, on a computer, preparing print material, primarily advertising and catalogs.  (Tr. 432-33)

Plaintiff testified that he had taken his standard medications the day of the hearing, including Provigil, or Modafinil, which as an anti-narcolepsy drug which also helps with depression; and Soboxon, Temazepam and Lorazepam.  (Tr. 434-36) Plaintiff had tried taking Ritalin recently, but had discontinued due to feelings of confusion and nervous energy. (Tr. 436)  Plaintiff testified that he was under the care of a psychiatrist, Dr. Garland, and a doctor, Dr. Osborne, who he sees as a special arrangement because Dr. Osborne is specially licensed to prescribe Suboxone, and is one of only twelve doctors in Arizona who can do so. (Tr. 437)  Plaintiff also saw a counselor at some point, although Dr. Garland was counseling Plaintiff presently.  (Tr. 447-48)

Plaintiff testified that he lives by himself. (Tr. 438) He eats out mostly, he writes, and enjoys working on his house, and enjoys having "a creative space to live in."  (Tr. 439) Plaintiff eats out almost always at the same place because its "really the only safe place outside of my house." (Tr. 446) He is otherwise very uncomfortable leaving his house and going to places he considers not safe.  (Tr. 447)  He sketches and does art work (Tr. 440), does not watch television, but does enjoy renting and going out to movies (Tr. 440).

Plaintiff testified that his general understanding of his psychiatric problems is that he has chronic recurrent major depression with major current depressive episodes.  (Tr. 440) He does not hear voices, but, prior to taking Soboxone, he did suffer auditory hallucinations. (Tr. 440)  He was freezing all the time, even with layers of sweaters, and even in August lying in the sun, he was unbearably bitter cold.  (Tr. 440-41)

Plaintiff had, in the past year, asked friends for work, but when he was honest about his condition with them, they informed him that it didn't seem they could fit him anywhere with his particular condition.  (Tr. 441)  Plaintiff had traveled to Japan in the last year, and had stayed there for a month with his language teacher. (Tr. 442-43) While there he became completely lost and completely disoriented.  (Tr. 447)  Plaintiff had studied the Japanese language for three and a half years, with lessons twice a week on Tuesdays and Thursdays.

1   (Tr. 443-44)

2       Plaintiff also traveled to Italy with family on vacation (Tr. 444-45) but also had

3   problems; while there he spent all his times "inside the castle walls with [his] family" which

4   after awhile felt safe to him (Tr. 447).

5       Plaintiff testified that he does not drink or smoke.  (Tr. 445)

6       Stacy Schonbrun, a vocational expert, testified in response to questions asked by the

7   ALJ. (Tr. 448) Ms. Rissell provided the exertional and skill level involved in Plaintiff's past

8   employment as retail sales - light exertion level, SVP of 2, and unskilled; graphic artist -

9   sedentary exertion level, SVP of 7, skilled.

10      Ms. Schonbrun was presented with the following hypothetical:   "...no exertionals or

11  other postural or manipulative problems because he's primarily with psychiatric problems.

12  However, he does have some problems with his asthma, and therefore he should work with -

13  - or excessive amounts of dust, fumes or chemicals which are of an excessive nature and

14  would be in excess of any kind of work that he's ever completed in his work job.  This

15  hypothetical person has some depression, anxiety, there are various other like a - - problems

16  that I've noticed in the medical records that some doctors thought there might have with

17  panic attacks or schizo [ph] difficult personality or a post-traumatic stress syndrome.  Now,

18  for the first hypothetical, I want you to assume that psychiatric problems would be of a slight

19  nature[2] and would have a slight affect on his ability to do basic work activities, or that

20  condition is or can be controlled by appropriate medication without significant adverse side

21  effects.  So could hypothetical person number two with slight psychiatric problems be able

22  to do any of the past work that was done by Mr. Ratoff."  (Tr. 450)  Ms. Schonbrun

23  responded affirmatively.  (Tr. 450)

24      The ALJ then proposed a second hypothetical, with all the same factors, except "now

25  the psychiatric problems are normally of a moderate affect.  They would normally have a

26

27      [2]     The vocational expert defined "slight nature" as having a small
28              effect that wouldn't preclude the activity on a regular and
                ongoing basis."  (Tr. 453)

moderate affect[3] on her ability  - - or his ability to do basic work activities; however, that condition is or can be controlled by appropriate medication without any significant, adverse side effects.   So could hypothetical person number two with moderate but controlled psychiatric problems be able to do any of the past work that was done by Mr. Ratoff?"  (Tr. 451)  Ms. Schonbrun responded affirmatively.  (Tr. 451)

The ALJ then proposed a third hypothetical, with all factors of the first hypothetical, except "now the psychiatric problems are severe; and they are so severe that there is no amount of psychotropic medication that would help alleviate all these problems; or if it did alleviate some of the psychiatric problems then the side effects of the psychotropic medication would be so significantly adverse that they would markedly interfere with ability to maintain pace and concentration.  So could hypothetical person number two with severe[4], uncontrolled psychiatric problems be able to do any of the work that was done by Mr. Ratoff?  (Tr. 451-52) Ms. Schonbrun responded that he could not.  (Tr. 452)

The ALJ then asked if that was the case, if there were any other kind of work in the national economy that this hypothetical person could do?   (Tr. 452) Ms. Schonbrun responded negatively.  (Tr. 452)

The ALJ proposed a fourth hypothetical, assuming hypothetical person number one, except as modified by Exhibit 4F, the report of Dr. Garland.  (Tr. 453) Ms. Schonbrun stated that the hypothetical person would not be able to do any of the work that was done by Mr. Ratoff, or any other kind of work in the national economy.  (Tr. 454)

C.     Plaintiff's Psychiatric History

Donald James Garland, Jr., M.D., a psychiatrist at the Psychiatric Department at University Medical Center first evaluated Plaintiff in May, 1998, and diagnosed Major Depressive Episode, Recurrent, Moderate to Severe. (Tr. 307) Treatment notes indicate that

---

[3] The vocational expert defined moderate effect as "fair limited but not precluded."  (Tr. 453)

[4] The vocational expert defined severe as being "precluded about 50 percent of the time."

1    Dr. Garland has managed Plaintiff's psychiatric care, on a nearly monthly basis or much
2    more frequently at times, since at least January 8, 2001. (Tr. 203-261, 298-393)

3        Chart notes document changes in Plaintiff's medication and Plaintiff's response and
4    progress.  According to a chart note dated October 2002, he was seeing a therapist, Diane
5    Hadsell, two to three times a week.  He had just returned from a trip to Maine for a reunion.
6    (Tr. 240) His medications included Xanax, a benzodiazepine tranquilizer, Buspar,  a minor
7    tranquilizer and anti-anxiety drug, Wellbutrin, an antidepressant medication, and Gabitril,
8    an anticonvulsant medication that can be prescribed for, *inter alia*, tremors and bipolar
9    disorder.  (Tr. 240; Defendant's Statement of Facts ("DSOF"), ¶ 2 n.3) Plaintiff was trying
10   to taper off of Xanax, and chart notes described gradual improvement.  (Tr. 229, 231, 232)
11   Chart notes also indicate that his recurrent major depression was in partial remission.  (Tr.
12   234)

13       During this same time period noting gradual improvement and that his major
14   depression was in partial remission, however, chart notes also indicate that he came to
15   appointments with his mother (Tr. 237-238), had a severe panic attack when he was talking
16   to an old friend and then "lost it" (Tr. 234), was working on "semi-independence" as a goal
17   (Tr. 232), worked on serious problems with communication (Tr. 230), had more panic
18   episodes (Tr. 229), and worked with his psychiatrist on severe cognitive distortions regarding
19   his self-worth and self-negation (Tr. 228).

20       On August 6, 2004, Dr. Garland noted that Plaintiff's condition was "fragile" with his
21   depression being in partial remission. (Tr. 214) In September 2004, Plaintiff was maintaining
22   positive gains, but was diagnosed with dysthymic disorder, a mood disorder characterized
23   by depressed feeling, loss of interest in one's usual activities, and other symptoms typical of
24   depression, but tending to be longer in duration and less severe than in major depressive
25   disorder. (Tr. 213, DSOF n.4) On October 12, 2004, Dr. Garland indicated that Plaintiff was
26   using sleep to "stay away" and that he had decreased social contact. He was taking Ativan,
27   a benzodiazepine tranquilizer, for anxiety, and was active at his dojo.  Dr. Garland's
28   diagnosis was recurrent depression.  (Tr. 212, DSOF, ¶ 8, n.5)  On November 4, 2004, Dr.

1   Garland evaluated Plaintiff with continued major depression.  (Tr. 211) On November 16,

2   2004, Plaintiff reported that he "tolerated Japan fairly well" but upon return had a bad

3   weekend and was significantly depressed.  (Tr. 210) Dr. Garland assessed Plaintiff with

4   recurrent major depression, and instructed him to follow up with Dr. Osborne.  (Tr. 210)

5        Dr. Osborne evaluated Plaintiff on November 17, 2004, and noted that he had tried

6   all previous anti-depressants in addition to Buspar and Gavatril without success.  (Tr. 201)

7   Because of his major depressive disorder, believed to be permanent, significant, and

8   untreatable, Dr. Osborne began Plaintiff on Suboxone treatment. (Tr. 202) Plaintiff returned

9   to Dr. Osborne on November 29, 2004, and Dr. Osborne reported that his impression was that

10  Plaintiff's chronic depression, chills, auditory hallucinations and suicidal ideations were

11  gone.  (Tr. 200)  Plaintiff continued on the Suboxone.  (Tr. 197-199)

12       In December 2004, Plaintiff reported that with Suboxone, he was able to do more, and

13  his sleep was improved.  Dr. Garland described him as "clearly improved".  (Tr. 209) By the

14  end of December, Plaintiff reported he was "doing well," not having suicidal ideation, going

15  to sleep "real easy" and not in crisis management mode."  (Tr. 208)

16       On January 26, 2005, 26 days after Plaintiff's insured status expired on December 31,

17  2004, Dr. Garland noted that Plaintiff had increased stress associated with his parents and

18  that he was in a "very stressful situation".  (Tr. 206)  In January 2005, Dr. Osborne described

19  Plaintiff's depression as "controlled but variable."  (Tr. 198)

20       In February 2005, Dr. Garland noted Plaintiff was feeling "floaty today", had

21  questions of not knowing where he was, problems with getting from Point A to Point B, was

22  not remembering names, and became disoriented after sleeping in a new house.  (Tr. 205) In

23  February 2005, Dr. Osborne described Plaintiff's depression as well controlled.  (Tr. 197)

24       As part of the disability evaluation process, the Disability Determination Service had

25  a non-examining psychologist, Paul Tangeman, Ph.D. review the case file.  (Tr. 180)  Dr.

26  Tangeman filled out a "Psychiatric Review Technique" form on May 24, 2005 in which he

27  concluded that Plaintiff had Impairments, Not Severe, (Affective Disorders, Depression NOS

28  and Anxiety-Related Disorders, Panic D/O) between October 2002 and December 2004 (AR

180). Dr. Tangeman checked only mild or no functional limitations. (Tr. 190) Dr. Tangeman explained that Plaintiff had received treatment for depression and anxiety for the period in question, and a review of the progress notes show a stable adjustment with treatment compliance. (Tr. 192)

Plaintiff was evaluated on July 6, 2005, at University Medical Center ("UMC"), and admitted that same date for suicidal ideation and attempt. (Tr. 167) Plaintiff reported that his present medication had been effective in controlling or maintaining his depression since November of the last year, however, it had been ineffective for the past month in controlling his symptoms. (Tr. 168) Plaintiff reported symptoms of decreased energy and poor sleep with nightmares, as well as auditory hallucinations, and feelings of disorientation, anxiety and panic attacks. (Tr. 168) Plaintiff's report on admission was dictated by resident physician in Psychiatry, Howard Lin, M.D., and signed John J. Standifer, M.D. Plaintiff was diagnosed with major depressive disorder, recurrent severe, most likely due to poor medication efficacy and social situation. (Tr. 172) Plaintiff's Global Assessment of Functioning ("GAF") score was 10. (Tr. 173)

Plaintiff was discharged from UMC on July 14, 2005. (Tr. 163) The discharge report, dictated by Lawrence Chan, DO., resident physician, and signed by Dr. Standifer, noted that Plaintiff's Axis I diagnosis on discharge was mood disorder, with an Axis II diagnosis of narcissistic histrionic schizotypical personality traits. (Tr. 163) Plaintiff's GAF score was 50. (Tr. 163) The report stated that Plaintiff "has been tried on multiple medications with little to no affect. The patient was started on Suboxone in November 2004, achieved moderate improvement in his depression including improvement in his suicidal ideation. The patient did well for a few months, however, in June his depression began to worsen despite compliance with his Suboxone regimen." (Tr. 163) Plaintiff was discharged to family on medications for insomnia and anxiety, and instructed to follow up with Dr. Garland with gender identity issues and sleep disorders clinic. (Tr. 165)

Dr. Garland closely followed Plaintiff, and initially saw improvement in Plaintiff following his suicide attempt. (Tr. 383-388) (Dr. Garland assessed Plaintiff from July 18,

2005 to July 26, 2005, with "improvement", "able to sleep", major depression in partial remission, ) After the initial improvement, Dr. Garland continued to see Plaintiff regularly, but his condition returned to his previous pattern of periods of "fragility" and depression interspersed with periods of stability and stress management. (Tr. 353-383) For example, on July 27, 2005, Plaintiff was assessed as "Fragile but managing". (Tr. 383) On September 28, 2005, Dr. Garland described Plaintiff as "Fairly stable." (Tr. 374) By his next appointment, on October 4, 2005, however, Plaintiff was again "Fragile." (Tr. 373)

A second non-examining state agency doctor, psychiatrist Jack A. Marks, M.D. reviewed the case on October 20, 2005, for the same time period between October 2002 to December 2004. (Tr. 148-161) Dr. Marks' also found a non-severe impairment (Affective Disorders, Depression NOS and Anxiety Related Disorders, Panic Disorder), and mild to no functional limitations (Tr. 148, 158). Dr. Marks wrote that Plaintiff is compliant with his therapy, and on medication. (Tr. 160) Dr. Marks suggested that Plaintiff suffers from some situational stress causing mood lability but that the progress notes indicate a lifting of his depression, so that his mental problems were not "severe" from Plaintiff's alleged onset date (i.e., October 2, 2002) through his date last insured for SSDIB (i.e., December 31, 2004). (Tr. 160)

On November 5, 2005, Dr. Garland once again made the assessment of "fragile" to describe Plaintiff's mental health. (Tr 353) On December 13, 2005 Dr. Garland noted that Plaintiff looked exhausted and he reported feeling down due to increased stress over the weekend. Dr. Garland's assessment was that Plaintiff had increased depression. (Tr 366) On January 6, 2006 Dr. Garland indicated that Plaintiff was upset with a contact with his father and was back in a crisis mode. (Tr. 348) On February 15, 2006 Dr. Garland noted that Plaintiff was again "[f]ragile." (Tr 340). On March 7, 2006 Dr. Garland noted that Plaintiff was improved but fragile still. (Tr. 335) On April 4, 2006 Dr. Garland noted that Plaintiff was devastated because his parents recently saw Ratoff's son without telling him and this was a "significant PTSD trigger". (Tr 326) On May 26, 2006 Dr. Garland noted Plaintiff's disappointment in two different encounters with women, and that Plaintiff was fragile with

his depression in partial remission. (Tr 310)

On July 31, 2006, Dr. Garland completed a form providing his opinion of Plaintiff's ability to do work related activities for the time period between October 1, 2002 through the present.  (Tr. 142, 145, 394) Dr. Garland noted that Plaintiff ability to understand and remember very short and simple instructions, carry out very short and simple instructions, make simple work related decision, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and be aware of normal hazards and take appropriate precautions would be seriously limited but not precluded.  (Tr. 394) Dr. Garland noted that Plaintiff's ability to remember work-like procedures, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted, and accept instructions and respond appropriately to criticism from supervisors would be unable to meet competitive standards. (Tr. 394) Finally, Dr. Garland noted that Plaintiff had no useful ability to function in the areas of carrying out very short and simple instructions, maintaining attention for two hour segments, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and responding appropriately to changes in a routine work setting. (Tr. 394)

Dr. Garland explained in his transcribed statement the basis for his clinical findings and how the various mental health work limitations that he placed on Plaintiff were supported by the evidence.  (Tr. 142-145) Dr. Garland explained that Plaintiff has a lot of problems getting to appointments on the right day or time, or to Japanese class, which has been held for years at the same day and time, and forgets what would be assigned as "homework" from Dr. Garland.  (Tr. 143) Dr. Garland opined that Plaintiff has difficulty in sustaining attention for more than minutes, and lose track of a conversation that they are having in therapy, and has serious problems maintaining his focus.  (Tr. 142) Dr. Garland also explained that Plaintiff has Schizotypal Personality Disorder, and that anyone with that

1  condition is going to have significant problems communicating, and will be very distracted

2  by persons communicating in a more casual fashion, and that Plaintiff in particular has

3  ongoing problems in getting connected with other persons.  (Tr. 144) These communication

4  difficulties tend to create real friction between himself and anyone who is trying to instruct

5  him in how to manage the particular job. (Tr. 144)  Additionally, Plaintiff does not function

6  in a normal 16 hours up, eight hours of sleep cycle, rather, Plaintiff has two sleep periods,

7  including a sleep period in the early afternoon, which is caused by his inability to sustain

8  consistently for any length of time.  (Tr. 144) Additionally, when Plaintiff at one time had

9  an irregular schedule, he was unable to respond to the changes, and failed to keep more than

10  half of his appointments.  (Tr. 144) Dr. Garland and his Japanese teacher responded by

11  having his appointments at the same time every week.  (Tr. 144)

12       Dr. Garland also explained that, in regards to his records of December 2004,

13  indicating that Plaintiff was doing well, this was not a conclusion that Plaintiff did not have

14  any mental problems that would impose any limitations on his ability to work. (Tr. 142) Dr.

15  Garland explained:

16       ...I reviewed that particular date in the records, and what had happened
         at that time is for the first time in many years Michael did not have suicidal
17       ideation.  That was the only basic change that had really occurred.  We had
         tried a new medication, and in documenting that, I certainly said that he was
18       improved.  The lack of suicidal ideation certainly is an improvement.  In
         contrast to a normally functioning person this does not say that he had regained
19       his level of function at all.

20  (Tr. 142)

21       D.   Lay Testimony

22       Plaintiff's parents submitted a statement to Plaintiff's attorney describing Plaintiff's

23  difficulty in managing his day to day activities.  (Tr. 137-138) Plaintiff's parents noted that

24  Plaintiff "generally does not know what month or day it is and he has a modest concept and

25  recognition of the time during the day."  (Tr. 137) Plaintiff's parents described Plaintiff as

26  fearful and untrusting of others and believes most people want to harm him.  (Tr. 137) He

27  limits contacts with others and has defined a few places as "safe" and "generally does not

28  venture outside his defined boundaries.  (Tr. 137) He has also chosen to remain silent, and

provides a document (enclosed with his parent's letter) which he give to people explaining

1   his actions in refusing to talk with them.  (Tr. 139) Plaintiff's parents explained that

2   Plaintiff's ex-wife has taken legal action related to Plaintiff's mental illness to deny Plaintiff

3   visitation with his a 12-year old son.  (Tr. 138) Plaintiff's parents provide Plaintiff with

4   financial support, but he is unable to effectively manage his money, so they manage his

5   financial requirements for him, such as paying his expenses such as utilities. (Tr. 138) They

6   provide him with a cash stipend for his daily needs because he overdrew his bank account.

7   (Tr. 138) He also abused his credit card that was to be used just for medicines.  (Tr. 138)

8   Plaintiff's parents note that Plaintiff "has a substantive medical support system, which has

9   not been able to sufficiently moderate his illness to allow him to function beyond a limited

10  basis." (Tr. 138) They "do not see any capacity to perform any activities beyond his current

11  capacity."  (Tr. 138)

12      Plaintiff's Japanese teacher, Keiko Naito, has known Plaintiff for four years and five

13  months.  (Tr. 136) Ms. Naito noted that his short-term memory is not fully functioning, for

14  instance, he often does not know why she is showing up in front of his house for Japanese

15  class at the usual time every week, and that in the middle of a conversation, all of a sudden

16  he does not remember what they are talking about.  (Tr. 136) Plaintiff cannot keep track of

17  changes in the schedule if the class is rescheduled.  (Tr. 136)

18      Linda Kalatz, a family friend who has known Plaintiff since he was eight, noted that

19  Plaintiff has suffered severe asthma since birth, causing "severe emotional and physical

20  problems his entire life."  (Tr. 146) Ms. Kalatz pointed out that Plaintiff was not able to

21  attend a regular high school since the pressures of schedule and his not knowing how he

22  would be physically were too much to handle.  (Tr. 146) Ms. Kalatz also noted that Plaintiff

23  often dresses inappropriately, and that, on one occasion, they waited 45 minutes for him to

24  meet them at dinner, and he did not show up.  He takes many strong prescriptions and was

25  not able to come to dinner.  (Tr. 146) At a recent family dinner, she observed that Plaintiff

26  spent hours by himself away from all guests because too much stimulation seems to disorient

27  him.  (Tr. 146)

28      E.    The Commissioner's Decision

On October 25, 2006, the ALJ made the following findings:

1.    The claimant meets the nondisability requirements for a period of disability and Disability Insurance benefits set forth in section 216(i) of the Social Security Act and is insured for benefits through December 31, 2004. Therefore the claimant must establish that his disability began on or prior to December 31, 2004.

2.    The claimant has not engaged in substantial gainful since the alleged onset of disability.

3.    The claimant has impairments which are considered "severe" based on the requirements in the Regulations. The evidence establishes the claimant has asthma by history; an affective disorder, depression, not otherwise specified; and an anxiety related disorder, viz., a panic disorder (20 CFR § 404.1520(c)).

4.    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.    The [ALJ] finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.    The claimant was born on October 12, 1966 and is currently forty years old. He completed high school and possess past relevant work as a graphic artist and sales clerk.

7.    The claimant's asthma precludes him from working around dusts, fumes and other chemicals.

8.    The claimant's mental impairments result in mild restriction of activities of daily living; mild to moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation or deterioration of extended duration. The evidence does not establish the presence of the "C" criteria with regard to Medical Listing 12.04 or 12.06. The claimant retains the mental residual functional capacity to perform simple, repetitive, as well as complex, detailed tasks on a sustained basis.

9.    The claimant's past relevant work as a graphic artist and sales clerk did not require the performance of work-related activities precluded by his residual functional capacity (20 CFR § 404.1565).

10.   The claimant's medically determinable impairments do not prevent the claimant from performing his past relevant work.

11.   The claimant was not under a "disability" as defined in the Social Security Act, at any time through December 31, 2004, his date last insured (20 CFR § 404.1520(f)).

(Tr. 30-31)

The ALJ noted that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of October 1, 2002. (Tr. 25) The ALJ found that, although Plaintiff had

1   a severe impairment, it did not prevent him from performing his past relevant work prior to

2   December 31, 2004.  (Tr. 26)

3        The ALJ noted that there is minimal evidence available with respect to the period at

4   issue.  (Tr. 26)  The ALJ found that the evidence did show that Plaintiff has a history of

5   treatment for depression with Dr. Garland, dating back to about 1999 with symptoms and

6   problems including problems sleeping, gender identity, passive suicidal ideation, and visual

7   hallucination, however, medication, including Seroquel, Ativan, and Ambien significantly

8   reduced his anxiety and other symptoms although he does remain somewhat depressed.  (Tr.

9   26) The ALJ noted that the evidence indicates continued improvement and reported Plaintiff

10  taking better care of himself on December 9, 2002 (Exhibit 1F).  (Tr. 26)  The ALJ further

11  noted that gradual improvement was again noted on January 7, 2003, and in March and April

12  2003, his depression was noted to be in moderate remission.  (Tr. 26) The ALJ remarked that

13  Plaintiff took a trip to Hawaii with his son in June 2003, and reported doing well in July

14  2003.  (Tr. 26) The ALJ noted that Plaintiff took a trip to Japan and reported having jet lag

15  on August 6, 2004; his depression was noted to be in partial remission.  (Tr. 26) The ALJ

16  observed that Plaintiff continued to report doing well on December 17, 2004; sleeping well,

17  some reduced appetite, but no suicidal ideation.  (Tr. 27) The ALJ pointed out that progress

18  notes through August 2005 indicate Plaintiff has his depression under good control with

19  medication.  (Tr. 27)

20       The ALJ commented that Dr. Osborne saw Plaintiff on November 17, 2004, and did

21  initially opine that Plaintiff had "significant, permanent and untreatable depression",

22  however, Dr. Osborne later reported that Plaintiff's depression was gone, with no auditory

23  hallucinations and no suicidal ideations, which Dr. Osborne attributed to change in

24  medication with increasing dosage.  (Tr. 27)

25       The ALJ found that, prior to December 31, 2004, the combination of Plaintiffs mental

26  impairments resulted in only mild restriction of activities of daily living; mild to moderate

27  difficulties in maintaining social functioning; mild difficulties in maintaining concentraion,

28  persistence or pace; and no repeated episodes of decompensation or deterioration of extended

1   duration.  (Tr. 27)

2       The ALJ found that Ms. Naito gave no opinions of Plaintiff functional abilities prior

3   to his date last insured, and therefore her opinions of his ability to function after his date last

4   insured were not at issue.  (Tr. 27)

5       The ALJ considered the opinions of Plaintiff's parents, and found that their opinion

6   that Plaintiff has modest short term memory difficulties, is fearful and untrusting of others,

7   and has difficulty managing money was in contrast with the other substantial evidence of

8   record which revealed that Plaintiff has no more than mild restrictions with functioning prior

9   to December 31, 2004. (Tr. 27-28) The ALJ found that, to the extent that Plaintiff's opinions

10  of functional limitations are not well supported by the other substantial evidence of record,

11  they are given very little weight with regard to his functional limitations prior to December

12  31, 2004.  (Tr. 28)

13      The ALJ also gave very little weight to Ms. Kalatz's opinion, explaining that she cited

14  only examples of his current functional limitations, opined that he has severe depression, but

15  did not actually note the level of his functional inabilities, and that her opinions were not

16  supported by the other substantial evidence of record with regard to his functional abilities

17  prior to December 31, 2004.  (Tr. 28)

18      The ALJ considered Dr. Garland's opinion of functioning abilities and clarifying

19  statement and rejected it for the following reasons.  First, the ALJ noted that Dr. Garland's

20  own progress notes did not reveal that Plaintiff's mental condition was of the severity he

21  reported on the assessment.  (Tr. 28) Second, the ALJ stated that the other substantial

22  evidence of record for the period indicates that a medication change has improved the

23  claimant's symptoms so significantly that as of November 29, 2004, his chronic depression

24  is gone.  (Tr. 28) The ALJ found that, to the extent Dr. Garland's opinions of functional

25  limitations are not well supported by the other substantial evidence of record, including the

26  Plaintiff's own admissions, they are not deserving of the great weight generally accorded to

27  a treating physician and are rejected for the period prior to December 31, 2004.  (Tr. 28)

28      The ALJ rejected Plaintiff's allegations of significant limitations for the following

reasons.  First, for the period prior to December 31, 2004, Plaintiff's allegations of significant limitations were not borne out in his descriptions of his daily activities.  Plaintiff admitted he is able to live alone, care for his personal needs, reads, writes, takes his medications as prescribed, prepares simple meals, does laundry and light cleaning.  Second, there is no evidence of sleep deprivation due to depression or anxiety.  Although he initially reported problems sleeping, he admitted that he slept much better with medication.  He has also been described as alert and in no acute distress.  Third, although the Plaintiff has reported that he is too disabled to work, the evidence suggests that he has no motivation to do so.  His parents have admitted that they support him financially, provide medical care and housing.  Fourth, although the Plaintiff has reported that he is too disabled to work, he admits that he enjoys going to movies, learning Japanese, traveling, and meeting friends at a café.  Fifth, the Plaintiff's medications have not caused disabling side effects.  Sixth, despite the Plaintiff's complaints of symptoms of depression and anxiety, Dr. Osborne noted the Plaintiff went from having "significant, permanent, and untreatable" depression on November 17, 2004, to having no symptoms of depression at all on November 29, 2004, with medication changes.  Seventh, no physician has opined the Plaintiff is permanently or totally disabled.  Eighth, the Plaintiff has alleged incapacitating symptoms and limitations.  However, the objective medical evidence of record does not reflect the existence of an impairment or combination of impairments which would produce the devitalizing symptoms alleged by the Plaintiff. (Tr. 29)

The ALJ found Plaintiff's combination of mental impairments resulted in mild restriction of activities of daily living; mild to moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation or deterioration of extended duration. (Tr. 27) The ALJ found Plaintiff repeated the mental residual functional capacity to perform simple repetitive as well as complex, detailed tasks on a sustained basis.  (Tr. 27)  Relying on the testimony of the vocational expert, the ALJ further found that Plaintiff's past relevant work as a graphic artist and a sales clerk are light in exertion and skilled, and unskilled, respectively.  (Tr. 30)

1  Relying on the vocational expert's testimony, the ALJ found that the Plaintiff was capable

2  of performing his past relevant work as previously performed and as generally performed in

3  the national economy, and, therefore, was not under a disability as defined in the Social

4  Security Act at any time through December 31, 2004.  (Tr. 30)

5          F.      Additional Evidence Presented to the Appeals Council

6          Following the adverse decision by the ALJ, the Plaintiff submitted a letter raising

7  several errors in the ALJ's decision to the Appeals Council, however, no further additional

8  evidence was submitted. (Tr. 18-20, 395-424) The Appeals Council rejected those arguments

9  in a brief letter which did not individually address the arguments Plaintiff's attorney raised,

10  stating only that the information did not provide a basis for changing the ALJ's decision.

11  (Tr. 8-10)

12  **III.  ISSUES**

13          A.      Plaintiff's Position

14          Plaintiff asserts that the ALJ erred by (1) rejecting the opinion of Plaintiff's treating

15  psychiatrist, Dr. Garland, by not giving clear and convincing reasons for doing so, and by not

16  giving Dr. Garldings opinion controlling weight, (2) in evaluating Plaintiff's credibility; (3)

17  in rejecting the lay witness statements; and (4) in failing to do a function-by-function

18  assessment of Plaintiff's residual capacity.  Plaintiff submits that this Court should overtun

19  the ALJ's decision and remand the case to the Commissioner for a finding that Plaintiff has

20  been disabled for Social Security disability purposes since October 1, 2002.

21          B.      Defendant's Position

22          Defendant contends that the ALJ properly rejected Dr. Garland's opinion, Plaintiff's

23  subjective complaints, and the lay witness statements.  Defendant also contends that the

24  ALJ's residual functional capacity finding was proper.  Defendant asserts that, even if this

25  Court were to find a reversible error in the ALJ's decision, a remand for further agency

26  proceedings, not immediate payment, would be warranted.

27  **IV.  DISCUSSION**

28          A.      Standard of Review

An individual is entitled to Title II Social Security Disability Insurance benefits ("SSDIB") if the individual is insured for those benefits, has not attained retirement age, has applied for those benefits, and is disabled.   42 U.S.C. § 423(a)(1).   The definition of disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A).

The Ninth Circuit has stated that "'a claimant will be found disabled only if the impairment is so severe that, considering age, education, and work experience, that person cannot engage in any other kind of substantial gainful work which exists in the national economy.'" *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993) (*quoting Marcia v. Sullivan*, 900 F.2d 172, 174 (9th Cir. 1990)).

The claimant has the burden to establish a prima facie case showing an inability to engage in previous occupations. *Thompson v. Schweiker*, 665 F.2d 936, 939 (9th Cir. 1982). The burden then shifts to the Commissioner  to show that other substantial work, for which the claimant is qualified, exists in the national economy.  *Id*.  (citing *Hall v. Secretary of HEW*, 602 F.2d 1372, 1375 (9th Cir. 1979); *Cox v. Califano*, 587 F.2d 988, 990 (9th Cir. 1978)).

The court will set aside a denial of benefits only if the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole. *Kail v. Heckler*, 722 F.2d 1496, 1497  (9th Cir. 1984) (citing *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir.1982), *Thompson v. Schweiker*, 665 F.2d 936, 939 (9th Cir.1982));  42 U.S.C. § 405(g)).  In determining whether there is substantial evidence, the Court must consider the evidence as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

Substantial evidence is "more than a scintilla," *Richardson v. Perales*, 402 U.S. 389, 401 (1971), but "less than a preponderance." *Sorenson v. Weinberger*, 514 F.2d 1112, 1119

1  n.10 (9th Cir. 1975);  *Desrosiers v. Secretary of Health and Human Servs.*, 846 F.2d 573,

2  576 (9th Cir. 1988).  Substantial evidence is "'such relevant evidence as a reasonable mind

3  might accept as adequate to support a conclusion.'"  *Richardson*, 402 U.S. at 401 (quoting

4  *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

5        The Commissioner, not the court, is charged with the duty to weigh the evidence,

6  resolve material conflicts in the evidence and determine the case accordingly.  Reviewing

7  courts must consider the evidence that supports as well as detracts from the examiner's

8  conclusion.  *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975).  Moreover, "if the

9  evidence can support either outcome, the court may not substitute its judgment for that of the

10  ALJ."  *Matney v. Sullivan*, 981 F.2d 1016,1019 (9th Cir. 1992).

11        Disability claims are evaluated pursuant to a five-step sequential process.  20 C.F.R.

12  §§404.1520, 416.920; *Baxter v. Sullivan*, 923 F.2d 1391, 1395 (9th Cir. 1991).  The first step

13  requires a determination of whether the claimant is engaged in substantial gainful activity.

14  20 C.F.R. §§ 404.1520(b).  If so, then the claimant is not disabled under the Act and benefits

15  are denied.  *Id*.  If the claimant is not engaged in substantial gainful activity, the ALJ then

16  proceeds to step two which requires a determination of whether the claimant has a medically

17  severe impairment or combination of impairments.  20 C.F.R. §§ 404.1520(c).  In making a

18  determination at step two, the ALJ uses medical evidence to consider whether the claimant's

19  impairment more than minimally limits or restricts the claimant's physical or mental ability

20  to do basic work activities.  *Id*.  If the ALJ concludes that the impairment is not severe, the

21  claim is denied.  *Id*.  Upon a finding of severity, the ALJ proceeds to step three which

22  requires a determination of whether the impairment meets or equals one of several listed

23  impairments that the Commissioner acknowledges are so severe as to preclude substantial

24  gainful activity.  20 C.F.R. §§ 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App.1.  If the

25  claimant's impairment meets or equals one of the listed impairments, then the claimant is

26  presumed to be disabled and no further inquiry is necessary.  If a decision cannot be made

27  based on the claimant's then current work activity or on medical facts alone because the

28  claimant's impairment does not meet or equal a listed impairment, then evaluation proceeds

1   to the fourth step.  The fourth step requires the ALJ to consider whether the claimant has

2   sufficient residual functional capacity ("RFC") to perform past work.    20 C.F.R. §§

3   404.1520(e).  If the ALJ concludes that the claimant has RFC to perform past work, then the

4   claim is denied.  *Id.*  However, if the claimant cannot perform any past work due to a severe

5   impairment, then the ALJ must move to the fifth step, which requires consideration of the

6   claimant's RFC to perform other substantial gainful work in the national economy in view

7   of claimant's age, education, and work experience.  20 C.F.R. §§ 404.1520(f).  At step five,

8   in determining whether the claimant retained the ability to perform other work, the ALJ may

9   refer to Medical Vocational Guidelines ("grids") promulgated by the SSA.  *Desrosiers*, 846

10  F.2d at 576-577.   The grids are a valid basis for denying claims where they accurately

11  describe the claimant's abilities and limitations.  *Heckler v. Campbell*, 461 U.S. 458, 462, n.5

12  (1983).   However, because the grids are based on exertional or strength factors, where the

13  claimant has significant nonexertional limitations, the grids do not apply.  *Penny*, 2 F.3d at

14  958-959; *Reddick v. Chater*, 157 F.3d 715, 729 (9th Cir. 1998). Where the grids do not apply,

15  the ALJ must use a vocational expert in making a determination at step five.  *Desrosiers*, 846

16  F.2d at 580.

17      A denial of Social Security benefits will be set aside if the Commissioner fails to

18  apply proper legal standards in weighing the evidence even though the findings may be

19  supported by substantial evidence.  *Winans v. Bowen*, 853 F.2d 643, 644 (9th Cir. 1987).

20  When the ALJ has applied an incorrect legal standard in reaching a decision, we must

21  remand unless, as a matter of law, the result could not be affected.  *See NLRB v. Enterprise*

22  *Assoc.*, 429 U.S. 507, 522 n.9 (1977); *Sagebrush Rebellion, Inc. V. Hodel*, 790 F.2d 760, 765

23  (9th Cir. 1986) (agency may rely on harmless error rule only when its mistake had no bearing

24  on the substance of the decision).

25      B.    Medical Source Opinions

26      The Ninth Circuit distinguishes among the opinions of three types of physicians:  (1)

27  those who treat the claimant (treating physicians);  (2) those who examine but do not treat

28  the claimant (examining physicians);  and (3) those who neither examine nor treat the

1    claimant (nonexamining physicians). *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995), as

2    amended (Apr. 9, 1996).

3         "By rule, the Social Security Administration favors the opinion of a treating physician

4    over non-treating physicians." See *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir.2007) (citing

5    C.F.R. § 404.1527). "Generally, a treating physician's opinion carries more weight than an

6    examining physician's, and an examining physician's opinion carries more weight than a

7    reviewing physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing

8    *Lester*, 81 F.3d at 830; 20 C.F.R. § 404.1527(d).  In addition, the regulations give more

9    weight to opinions that are explained than to those that are not and more weight to the

10   opinions of specialists concerning matters relating to their specialty over that of

11   nonspecialists.  *Holohan*, 246 F.3d at 1202 (citing 20 C.F.R. §§  404.1527(d)(5) and

12   404.1527(d)(3)). Under the regulations, if a treating physician's medical opinion is supported

13   by medically acceptable diagnostic techniques and is not inconsistent with other substantial

14   evidence in the record, the treating physician's opinion is given controlling weight.  *Id*.

15   (citing 20 C.F.R. S 404.1527(d)(2);  Social Security Ruling (SSR) 96-2p).

16        More weight is given to a treating physician's opinion than to the opinion of a

17   nontreating physician because a treating physician "is employed to cure and has a greater

18   opportunity to know and observe the patient as an individual." *Andrews v. Shalala*, 53 F.3d

19   1035, 1041 (9th Cir. 1995) (quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (quoting

20   *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987))).  "Likewise, greater weight is

21   accorded to the opinion of an examining physician than a non-examining physician."

22   *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995)(citing 20 C.F.R. § 416.927(d)(1);

23   *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990).

24        The ALJ may reject the opinion of a treating physician, whether or not controverted;

25   however, the ALJ may reject an uncontroverted opinion of a treating physician only for clear

26   and convincing reasons. *Andrews*, 53 F.3d at 1041.  To meet this burden, the ALJ must set

27   out a detailed and thorough summary of the facts and conflicting clinical evidence, state his

28   interpretation of the facts and evidence, and make findings. *Magallanes v. Bowen*, 881 F.2d

1    747, 751 (9th Cir. 1989).  To reject the opinion of a treating physician which conflicts with

2    that of an examining physician, the ALJ must "'make findings setting forth specific,

3    legitimate reasons for doing so that are based on substantial evidence in the record.' "

4    *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir.1987), (quoting *Sprague*, 812 F.2d at 1230);

5    see also *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983) (adopting this rule).  "The ALJ

6    can meet this burden by setting out a detailed and thorough summary of the facts and

7    conflicting clinical evidence, stating his interpretation thereof, and making findings." *Cotton*

8    *v. Bowen*, 799 F.2d 1403, 1408 (9th Cir.1986).

9            Furthermore, the ALJ must set out specific and legitimate reasons for rejecting a

10   treating doctor's credible opinion on disability.  See *Reddick v. Chatter*, 157 F.3d 715, 725

11   (1998).  In the absence of other evidence to undermine the credibility of a medical report, the

12   purpose for which the report was obtained does not proved a legitimate basis for rejecting

13   it.  *Id*. at 726.

14           The Social Security Adminstration has explained that an ALJ's finding that a treating

15   source medical opinion is not well-supported by medically acceptable evidence or is

16   inconsistent with substantial evidence in the record means only that the opinion is not entitled

17   to controlling weight, not that the opinion should be rejected. See *Orn*, 495 F.3d at 632

18   (citing § 404.1527). Treating source medical opinions are still entitled to deference and, in

19   many cases, will be entitled to the greatest weight and should be adopted, even if it does not

20   meet the test for controlling weight." *Orn*, 495 F.3d at 632; see also *Murray v. Heckler*, 722

21   F.2d 499, 502 (9th Cir.1983) ("If the ALJ wishes to disregard the opinion of the treating

22   physician, he or she must make findings setting forth specific, legitimate reasons for doing

23   so that are based on substantial evidence in the record.")

24           C.    Analysis - Treating Physician

25           Dr. Garland was Plaintiff's treating psychiatrist from 1998 through and beyond

26   Plaintiff's date last insured.  Dr. Garland's opinion is uncontradicted by any examining

27   mental health professional, and can therefore be rejected only with clear and convincing

28   evidence. *Andrews*, 53 F.3d at 1041.  By rule, the Social Security Administration favors the

1   opinion of treating physicians, and accords it controlling weight unless it is not well-
2   supported or because it is inconsistent with other substantial evidence in the record.  See 20
3   C.F.R. § 414.1527; see also *Orn v Astrue*, 495 F.3d 625, 631 (2007).  If a treating physician's
4   opinion is not given "controlling weight" because it is not "well-supported" or because it is
5   inconsistent with other substantial evidence in the record, the Administration considers
6   specified factors in determining the weight it will be given.  Those factors include. the
7   [l]ength of the treatment relationship and the frequency of the examination" by the treating
8   physician; the "nature and extent of the treatment relationship" between the patient and the
9   treating physician; the relevant evidence used to support an opinion; the consistency of the
10  record as a whole, whether or not an opinion is from a specialist about medical issues related
11  to his or her area of specialty; and any other factor which tends to support or contradict the
12  opinion. Id. § 404.1527(d)(2)-(6).  Additionally, since neither Dr. Tangeman nor Dr. Marks
13  examined Plaintiff, their opinions cannot, by themselves, constitute substantial evidence that
14  justifies the rejection of the Dr. Garland's opinion.  *See Lester*, 81 F.3d 831.

15          The ALJ provided two reasons for rejecting Dr. Garlands disability opinion.  The two
16  reasons provided by the ALJ for rejecting Dr. Garland's opinion are insufficient.  The
17  reasons are not "specific and legitimate" nor are they supported by "substantial evidence."
18  In fact the record, read as a whole, in context, contradicts them. See *Reddick*, 157 F.3d 725;
19  see also *Murray*, 722 F.2d 502.   First, the ALJ noted that Dr. Garland's own progress notes
20  did not reveal that Plaintiff's mental condition was of the severity he reported on the
21  assessment.  (Tr. 28)  This conclusion is not supported by the evidence.  Dr. Garland
22  explained in detail the basis for his opinion of functional limitations, and the progress notes,
23  read in their full context, support his explanation.

24          Dr. Garland explained that Plaintiff had major depressive episode, recurrent, moderate
25  to severe.  (Tr. 141) Dr. Garland explained that the criteria for that diagnosis was difficulty
26  with sleep patterns, appetite, energy, suicidal thoughts, poor self-esteem, weight loss or
27  weight gain, and decreased ability to focus or concentrate.  (Id.)  While at times Dr. Garland
28  did note improvement and that Plaintiff's depression was in remission, at other times, prior

1   to Plaintiff's date last insured, Dr. Garland reported a decrease in appetite (Tr. 208),
2   significant depression (Tr. 210), feeling displaced (Tr. 212), using sleep to stay away (Id.)
3   decreased social contact (Id.), continuing depression, (Tr. 213), variable sleep (Tr. 219, 222),
4   doing better but is depressed (Tr, 228), worked with Plaintiff on severe cognitive distortions
5   regarding his self-worth (Id.), decreased concentration (Tr. 238), abrupt shift to a more
6   depressed mood (Tr. 242), sleep somewhat fractured (Id.) passive suicidal ideation (Tr. 242),
7   being up and down but really "down and downer" (Tr. 243), sleep a problem (Tr. 245),
8   tearful at times, sleep interrupted (Tr. 247), anxiety increased, sleep decreased (Tr. 257),
9   falling asleep sometimes a problem (Tr. 259), mood - somewhat labile, but no steady
10  depression (Tr. 259), sleep variable, mood - down but not severely (Tr. 261).  Additionally,
11  on several visits Dr. Garland assessed Plaintiff as "fragile" (Tr. 214), as having dysthymic
12  disorder (Tr. 213), recurrent depression (Tr. 212), and after two years of very active
13  management of Plaintiff's treatment, concurrent with weekly or even biweekly counseling
14  or psychotherapy sessions, Dr. Garland assessed Plaintiff with recurrent major depression
15  and after attempting to treat Plaintiff with "all previous anti-depressants" without success,
16  (Tr. 201) referred Plaintiff to Dr. Osborne.

17      Dr. Garland also explained that Plaintiff had a panic disorder.  Progress notes discuss
18  a severe panic attack that occurred when he was talking to an old friend and then "lost it" (Tr.
19  234), and other panic episodes that occurred during the relevant period (Tr. 229).  Although
20  Dr. Garland did not apparently document every episode or panic attack that Plaintiff
21  experienced, Dr. Garland would occasionally document improvements, such as "Pt's
22  anxiety/panic levels only partially controlled [with] Xanax."  (Tr. 243)

23      Dr. Garland explained that the basis for his diagnosis of Plaintiff with Post Traumatic
24  Stress Disorder ("PTSD")was a number of problems in his background, more recently
25  occurring around his marriage and repeated legal problems between he and his ex-wife.  (Tr.
26  142) Discussions of Plaintiff's legal situation regarding Plaintiff's son are consistent
27  throughout Dr. Garland's progress notes.   The progress notes also include a phone
28  consultation where Plaintiff was "verbally accosted at his son's school [and] then has been

1    contacted by [the Tucson Police Department] re possible charges." (Tr. 258) Dr. Garland's

2    notes indicate an assessment of PTSD superimposed over panic disorder in January 2002,

3    when Plaintiff reported the holidays were stressful, and he didn't get time with his son

4    despite exhaustive efforts to do so. (Tr. 251)

5            It is evident when read in context, and read as a whole, that Dr. Garland's progress

6    notes are no more or less than what they profess to be - clinical notations of Plaintiff's

7    treatment progress from a baseline starting point, when Dr. Garland first began treating

8    Plaintiff, through the course of his treatment as his mental health both improved and, at

9    times, became worse. That is to say, Dr. Garland's notations of "improved" or "improving"

10   cannot be equated with having no functional limitations, as the progress notes were never

11   meant to document his functional limitations or to assess his mental or cognitive capabilities.

12   Ultimately, despite Plaintiff's progress, or lack thereof, Dr. Garland assessed Plaintiff, in

13   November 2004, with recurrent major depression. (Tr. 210)   When asked to assess his

14   functional limitations, Dr. Garland did so, and provided a basis for doing so that, contrary

15   to the ALJ's assertions, was fully supported by the evidence.

16           The ALJ's second reason for rejecting Dr. Garland's opinion is also not supported by

17   the evidence.  The ALJ stated that a medication change has improved the claimant's

18   symptoms so significantly that as of November 29, 2004, his chronic depression was gone.

19   (Tr. 28) The ALJ thus concluded that, to the extent Dr. Garland's opinions were not

20   supported by the other substantial evidence of record, including the Plaintiff's own

21   admissions, they were not deserving of the great weight generally accorded to a treating

22   physician and were rejected for the period prior to December 31, 2004. (Id.)

23           Dr. Osborne did report on November 29, 2004, that after treatment began with

24   Suboxone that, along with his previous symptoms of chills, auditory hallucinations, and

25   suicidal ideation, his chronic depression was "gone." (Tr. 284) Dr. Garland noted that

26   Plaintiff had decreased suicidal ideation and increased focus on December 7, 2004, and

27   Plaintiff was "clearly improved." (Tr. 209) By December 17, 2004, Dr. Garland noted that

28   Plaintiff reported not having suicidal ideation and was "clearly improved." (Tr. 208) But on

1    January 7, 2005, only seven days past the date last insured, Dr. Garland noted that while

2    Plaintiff had a clear improvement in mood, his depression was only in moderate remission,

3    and Plaintiff was reporting increased tension and anxiety.  (Tr. 207) On January 26, 2005,

4    less than a month after his date last insured, Plaintiff was reporting increased stress.  (Tr.

5    206)  By January 31, 2005, however, Dr. Osborne noted that, while Plaintiff's depression

6    was controlled, it was variable, and increased his Suboxone dosage.  (Tr. 198)   His

7    depression was again "well controlled" by February 28, 2005. (Tr. 197)  By July 2005,

8    Plaintiff was admitted to UMC for suicidal ideation and attempt, and diagnosed with major

9    depressive disorder, recurrent severe, most likely due to poor medication efficacy and social

10   situation. (Tr. 172)  On November 5, 2005, Dr. Garland once again made the assessment of

11   "fragile" to describe Plaintiff's mental health.  (Tr. 353)  On December 13, 2005 Dr. Garland

12   noted that Plaintiff looked exhausted and he reported feeling down due to increased stress

13   over the weekend. Dr. Garland's assessment was that Plaintiff had increased depression. (Tr.

14   366)

15          Again, the ALJ's statement, "that as of November 29, 2004, his chronic depression

16   is gone"(Tr. 28), read in the context of the entire record is not supported by the evidence, nor

17   is it convincing.  But for the improvement initially seen in the few months following the

18   initial course of treatment with Suboxone, the evidence demonstrates that Plaintiff not only

19   did not maintain at the level of improvement initially observed, but, within less than a year

20   worsened to the point of a suicide attempt and to the point where he was diagnosed at UMC

21   with major depressive disorder, recurrent *severe*.  (Tr. 172) Plaintiff's mental health history,

22   as noted above, demonstrates both episodes of improvement, decline, and plateaus.  The

23   illustration which the ALJ chose to demonstrate that Plaintiff no longer had chronic

24   depression was perhaps the highest peak in all of the mountains, valleys and plateaus of

25   Plaintiff's progress, but it was not sustained for any appreciable amount of time, and was not

26   indicative of Plaintiff's functional ability.

27          Dr. Garland explained in his interview the progress that Plaintiff had achieved during

28   the time period following initial treatment with Suboxone: "...for the first time in years

- 26 -

1    Michael did not have suicidal ideation.  That was the only basic change that had really

2    occurred.  We had tried a new medication, and in documenting that, I certainly said that he

3    was improved.  The lack of suicidal ideation certainly is an improvement.  In contrast to a

4    normally functioning person this does not say that he had regained his level of function at

5    all." (Tr. 142)

6          Because the ALJ erred in evaluating Dr. Garland's opinion, and in not giving Dr.

7    Garland's opinion controlling weight, the Magistrate Judge recommends that the District

8    Judge reverse the decision that plaintiff is not disabled.

9          D.     Plaintiff's Credibility

10         "An ALJ is not required to believe every allegation of disabling pain or other

11   nonexertional impairment." *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007) (internal

12   quotation marks and citation omitted).  While an ALJ is responsible for determining the

13   credibility of a claimant, an ALJ cannot reject a claimant's testimony without giving clear and

14   convincing reasons. *Holohon v. Massanari,* 246 F.3d 1195, 1208 (9th Cir. 2001) (citing

15   *Reddick*, 157 F.3d at 722.)  In addition, the ALJ must specifically identify the testimony she

16   or he finds not to be credible and must explain what evidence undermines the testimony. *Id*.

17   The evidence upon which the ALJ relies must be substantial.  *Id*.  In assessing the claimant's

18   credibility, the ALJ may consider ordinary techniques of credibility evaluation, such as the

19   claimant's reputation for lying, prior inconsistent statements about the symptoms, and other

20   testimony from the claimant that appears less than candid; unexplained or inadequately

21   explained failure to seek or follow a prescribed course of treatment; the claimant's daily

22   activities; the claimant's work record; observations of treating and examining physicians and

23   other third parties; precipitating and aggravating factors; and functional restrictions caused

24   by the symptoms. *Smolen*, 80 F.3d at 1284. *See also Robbins*, 466 F.3d at 884 ("To find the

25   claimant not credible, the ALJ must rely either on reasons unrelated to the subjective

26   testimony (*e.g.*, reputation for dishonesty), on conflicts between his testimony and his own

27   conduct; or internal contradictions in that testimony.")

28         E.     Analysis - Plaintiff's Credibility

1      The ALJ gave provided eight reasons for rejecting the Plaintiff's testimony.  (Tr. 29)

2           1.    *Daily Activities*

3      The ALJ rejected Plaintiff's testimony, stating, as his first reason for doing so, that

4  "for the period prior to December 31, 2004, the claimant's allegations of significant

5  limitations are not borne out in his description of his daily activities.  Even after his date last

6  insured, he admitted that he is able to live alone, care for his personal needs, reads, writes,

7  takes his medications as prescribed, prepares simple meals, does laundry and light cleaning.

8  (Tr. 29)    The fourth reason the ALJ stated for discrediting Plaintiff was that, although

9  Plaintiff has reported that he is too disabled to work, he admits that he enjoys going to

10  movies, learning Japanese, traveling, and meeting friends at a café.  (Tr. 29)

11      The Ninth Circuit "has repeatedly asserted that the mere fact that a plaintiff has

12  carried on certain daily activities ... does not in any way detract from her credibility as to her

13  overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 150 (9th Cir. 2001).

14      The ALJ did not question Plaintiff during the hearing about any of his limitations.

15  (Tr. 425-455) The only allegations that Plaintiff alleged, therefore, and that the ALJ rejected,

16  must have been derived from Plaintiff's disability reports.

17      A Field Office - Disability Report was completed by interview with Plaintiff on

18  February 25, 2005.   (Tr. 133-35) The interviewer noted that Plaintiff had difficulty

19  concentrating, talking, and answering.  (Tr. 134) Specifically, the interviewer wrote that

20  Plaintiff "appeared a little nervous at outset.  He was slow thinking and talking at times.  He

21  had to refocus in order to answer." (Tr. 134) Plaintiff completed the report, responding to

22  the questions how his illnesses, injuries or conditions limit his ability to work, with:

23  "Disorientation, suicidal ideation, exhaustion; auditory hallucinations; inability to focus,

24  cannot be around more than 1 person; not comfortable around other people; I will hide and

25  cry if I am around too many people" (Tr. 127) Plaintiff stated that he stopped working

26  because he could not focus on his work, people, or numbers.  He was getting anxiety and was

27  becoming irritated.  (Tr. 127)

28      In March 2005, Plaintiff completed a Function Report, noting that he lives alone in

1   a house, and goes to doctor's appointments, reads and writes, and takes medicine.  (Tr. 110)
2   While on medication, Plaintiff is able to adequately take care of personal hygiene, but
3   requires reminders on notes or whiteboards "for everything,"including taking medication.
4   (Tr. 112) Plaintiff fixes soups, sandwiches and salads, but not daily, and his parents help him
5   by inviting him to dinner, or he eats out.  (Tr. 112) Plaintiff does laundry, although he
6   requires a whiteboard reminder to help with this.  (Tr. 112) Plaintiff goes outside, and can
7   walk, drive, or ride a bicycle.  (Tr. 113) Plaintiff can shop, but he is unsure how often he
8   shops, and how long it takes.  (Tr. 113) Plaintiff does not pay bills, or handle his checking
9   or savings account.  (Tr. 113) His family pays most of his bills.  (Tr. 113) Plaintiff describes
10  remembering planning and more control of his finances prior to his illness.  (Tr. 114)

11          Plaintiff's hobbies and interests are reading, martial arts, and studying Japanese.  (Tr.
12  114) Plaintiff goes to martial arts training, the Muse Community Arts Center, and the dojo
13  in Phoenix once a month.  (Tr. 114) Plaintiff notes that his condition affects his memory,
14  completing tasks, concentration, understanding, following instructions, and getting along
15  with others.  (Tr. 115) Plaintiff states that he does not follow written instructions very well,
16  is worse at following spoken instructions, and sometimes finishes what he starts.  (Tr. 115)
17  Plaintiff states that he does not get along at all with authority figures, and handles changes
18  in his routine very badly.  (Tr. 116)

19          Plaintiff remarked additionally that he has a great deal of difficulty with forms and
20  linear time, and that he does not like people, and suffers from chronic recurrent depression.
21  (Tr. 117)  Plaintiff further remarked that so many things have changed that he is not really
22  sure of explaining and that it is hard for him to see how things "used to be."  (Tr. 117)

23          Plaintiff has described a few particular things that he enjoys doing, and places he goes
24  that he feels are "safe."  Eating at one café and going to the movies are two such "safe"
25  places.  He studies Japanese at his home, or at the café.  He has traveled, but for the most part
26  describes difficulty doing so, although some family vacations have been without remarkable
27  incident, (Hawaii) others have been remarkably difficult, such as his family trips to Italy and
28  Kentucky, and his vacation to Japan.

1       The Government argues that it is reasonable for the ALJ to infer from the evidence

2   that Plaintiff's depression, while imposing some limitations, was not totally incapacitating.

3   (Doc. No. 21, at 8)  Claimants, however, need not be "utterly incapacitated" in order to be

4   eligible for benefits.  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  The ALJ did not

5   explain how Plaintiff's testimony, that he lives alone, care for his personal needs, reads,

6   writes, takes his medications as prescribed, prepares simple meals, does laundry and light

7   cleaning, are activities that would transfer to the work environment.  This is especially true

8   in light of Plaintiff's particular illness, which does not necessarily limit his ability to

9   physically complete certain tasks.  To the extent that the ALJ concludes that Plaintiff's

10  activities of daily living render his allegations of limitations beyond belief, the ALJ has

11  focused only on those statements which support such a conclusion and ignored those which

12  do not.

13      For example, while the ALJ stated that Plaintiff prepares simple meals (Tr. 29), he

14  ignored the other statements in the "Function Report" where Ratoff indicated that he does not

15  prepare food or meals daily all the time, that he is not sure how long it takes him, and that

16  his parents will help him by inviting him to dinner. (Tr.112)  In addition, the ALJ notes in

17  his decision that Plaintiff indicates that he lives alone (Tr. 29) but ignores the fact that

18  Plaintiff also indicated that his family must pay his bills because he does not have a savings

19  account and does not use checks.  (Tr. 113)  The ALJ further ignored the fact that Plaintiff

20  indicated that he does not spend time with others (Tr. 114), and that his illness affected his

21  ability to remember things, complete tasks, concentrate, understand, follow instructions, and

22  get along with others. (Tr. 115)

23              2.    *Sleep Deprivation*

24      The ALJ noted that the second reason for rejecting the Plaintiff's allegations was that

25  there was no evidence of sleep deprivation due to depression or anxiety.  (Tr. 29) The ALJ

26  noted that, although he initially reported problems sleeping, he admitted that he slept much

27  better with medication, and has also been described as alert and in no acute distress.  (Id.)

28      Initially, it should be noted that the ALJ does not explain why this observation would

detract from Plaintiff's credibility.   It appears that the ALJ is attempting to find that Plaintiff's allegation, that he has depressive disorder, is not well supported because Plaintiff does not demonstrate one of the diagnostic criteria for depression, *i.e.*, sleep deprivation. The ALJ, however, found that Plaintiff had three severe medically determinable impairments: asthma; an affective disorder, viz., depression, not otherwise specified; and an anxiety related disorder, viz., a panic disorder.  (Tr. 27) Thus, to the extent that the ALJ is attempting to discredit Plaintiff's allegation that he has depressive disorder, it is not supported by the record, or by the ALJ's own findings.  To the extent that the ALJ is attempting to discredit Plaintiff by noting inconsistencies in the record, or in Plaintiff's testimony, that, also, is not well supported.  Plaintiff did not testify that he suffered from sleep deprivation.  Plaintiff alleged that he had "nightmares, fear of sleep."  (Tr. 111) Plaintiff did not elaborate much beyond this description, as to how, functionally, his sleep difficulties would limit his ability to work.  Plaintiff did defer to his doctors for a "better understand[ing] of his condition."  (Tr. 117)

Dr. Garland observed that Plaintiff had difficulties functioning at a normal "16 hours up, eight hours of going to bed" cycle.  (Tr. 144) Dr. Garland noted that Plaintiff generally has two sleep periods, and attributed this to his inability to "sustain consistently for any length of time" rather than sleep difficulties.  (Tr. 144) As to Plaintiff's insomnia, Dr. Garland's treatment notes did indicate on several instances that Plaintiff had difficulty with sleep, and Dr. Garland discussed management of Plaintiff's insomnia with medication. (See Tr. 212, 219, 222, 242, 245, 254, 257, 259, 260 and 261)  Plaintiff submitted disability reports that indicated that he was prescribed medications for the purpose of treating his difficulties with sleep problems.  (Tr. 83, 98)  Additionally, it appears that, at least initially, Plaintiff's Suboxone treatment provided relief in this area, as well as improving his mood. (Tr. 207-209)

The ALJ's description of Plaintiff as "alert and in no acute distress" is not well supported.  The ALJ cites to exhibit 1-F in support of this description.  In addition to the Psychiatric Review Technique's completed by the state agency reviewers, Exhibit 1-F

1   contains treatment notes from Dr. Garland, Dr. Osborne, and from UMC during July 2005,

2   when Plaintiff was admitted and diagnosed with major depressive disorder, recurrent severe.

3   (Tr. 148-268) It is only in the treatment notes from UMC that Plaintiff is described, upon

4   admission, as "alert" (Tr. 172), and upon discharge as "in no acute distress" (Tr. 165).  The

5   treating psychiatrists at UMC discharged Plaintiff on two different medications for treatment

6   of insomnia.  (Tr. 165) During the treatment period at UMC, it was noted that Plaintiff

7   experienced severe insomnia, and "did not sleep three days while on the unit."  (Tr. 164)

8   After trials of different medications, Plaintiff continued to have difficulty with insomnia, but

9   finally responded to doses of Ambien and Seroquel, and was sleeping an average of 4-5

10  hours a night toward the end of his hospital course. (Tr. 164) It is disingenuous for the ALJ

11  take the words "alert and in no acute distress" out of the context of this record in an attempt

12  to discredit Plaintiff's allegations of sleeping difficulty.

13              3.    *No Motivation*

14          The ALJ states as a third reason for discrediting Plaintiff, that "although he has

15  reported that he is too disabled to work the evidence suggests that he has no motivation to

16  do so.  His parents have admitted that they support him financially, provide medical care and

17  housing." (Tr. 29) The ALJ's interpretation of the evidence is speculative at best, and biased

18  at worst.  The evidence is "suggestive" of many things, among others that Plaintiff is

19  disabled, cannot work, and is in need of financial support which his parents "admittedly"

20  provide.  In the absence of any evidence in the record, however, as to whether or not Plaintiff

21  is motivated to work, and considering the possibility that such lack of motivation, if it

22  existed, could be related to his impairment, it is improper for the ALJ to rely on this

23  speculation to discredit Plaintiff.

24              4.    *Medication Side Effects*

25          The ALJ states as the fifth reason for rejecting Plaintiff's credibility that the Plaintiff's

26  medications have not caused disabling side effects. (Tr. 29) This statement, by itself, without

27  demonstration that Plaintiff testified to disabling side effects that conflicted with evidence

28  of record or between such testimony and his own conduct; or internal contradictions in that

1  testimony, is not a relevant indicator of Plaintiff's credibility.  See *Smolen*, 80 F.3d at 1284.

2  *See also Robbins*, 466 F.3d at 884.  Furthermore, the ALJ does not explain why a finding that

3  there are no disabling side effects renders Plaintiff's allegations not credible.  An ALJ must

4  specifically identify the testimony she or he finds not to be credible and must explain what

5  evidence undermines the testimony. *Holohon,* 246 F.3d at 1208.  The evidence upon which

6  the ALJ relies must be substantial.  *Id.*

7                    5.        *No Symptoms of Depression on November 29, 2004*

8            The sixth reason the ALJ rejected Plaintiff's allegations for lack of credibility was,

9  "despite the claimant's complaints of symptoms of depression and anxiety, Dr. Osborne

10  noted the claimant went from having 'significant, permanent and untreatable' depression on

11  November 17, 2004, to having no symptoms of depression at all on November 29, 2004, with

12  medication changes (Exhibit 1F/53-55)."  (Tr. 29)  This reason is not supported by the

13  evidence, for the same reasons the Magistrate Judge found the ALJ's second reason for

14  rejecting Dr. Garland's opinion improper, as previously discussed in section IV.C., above.

15                   6.        *No Physician Opinion of Disability*

16            The ALJ states as the seventh reason for finding Plaintiff not credible that, during the

17  relevant period, no physician has opined that the Plaintiff is permanently or totally disabled.

18  (Tr. 29) This conclusion is not supported by the record.  To the contrary, Dr. Garland

19  prepared a statement in which he offered his opinion as to Plaintiff's mental limitations for

20  the period from October 1, 2002 to present. (Tr. 142-145, 394). Plaintiff's inability to respond

21  appropriately to changes in a routine work setting, by itself, would prevent him from doing

22  the "basic mental demands of competitive, remunerative, unskilled work". (Tr. 394)  To the

23  extent that the ALJ is asserting that no physician offered the opinion itself, contemporaneous

24  with or prior to the end of, the relevant period, it seems apparent from the record that there

25  is no opinion prior to December, 2004, because no opinion was necessary until Plaintiff

26  applied for benefits.  The opinion is not inconsistent with the treatment notes during the

27  relevant period, of which there is ample documentation of Plaintiff's disability.

28

7. *No Objective Medical Evidence*

Lastly, the ALJ rejected Plaintiff's credibility for the reason that Plaintiff alleged incapacitating symptoms and limitations, but the "objective medical evidence of record" does not reflect the existence of an impairment that would produce those type of symptoms. (Tr. 29). Plaintiff suffers from anxiety and depression, and it is not clear what objective medical evidence the ALJ would require Plaintiff to produce to substantiate such symptoms.  As Plaintiff argues, Plaintiff's problems cannot be documented by an x-ray. As SSR 96-8p notes, "Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone". The ALJ erred in this case by failing to give the evidence such careful consideration in evaluating Plaintiff's credibility. This error is further confounding because the ALJ acknowledged that Ratoff did have severe mental impairments. (Tr. 30).

In sum, the ALJ's reasons for finding Plaintiff not credible are not supported by substantial evidence.

F.     Lay Witness Testimony

Lay testimony making a medical diagnoses is beyond the competence of lay witnesses and do not constitute competent evidence requiring consideration by the ALJ. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996)(citing *Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir. 1984).  However, lay testimony as to a claimant's symptoms is competent evidence which the ALJ must take into account unless he expressly determined to disregard such testimony, in which case he must give reasons that are germane to each witness. *Nguyen*, 100 F.3d at 1467 (citing *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993)).

1.     *Keiko Naito*

The ALJ rejected the statements of Plaintiff's Japanese teacher, Keiko Naito, on the basis that Ms. Naito gave no opinions of Plaintiff's functional abilities prior to his date last insured, therefore, her opinions to function after his date last insured are not at issue.  (Tr. 27)

2. *Plaintiff's Parents*

The ALJ discussed the opinions of Plaintiff's parents, stating that the "substantial evidence of record reveals the claimant has no more than mild restrictions with functioning prior to December 31, 2004.  His treating psychiatrists have all noted good improvement in his symptoms and functioning since treatment with medications and therapy."  The ALJ found the opinions of Plaintiff's parents not applicable after the date last insured, and before the date last insured, gave the opinions very little weight as the ALJ found them not well supported by the other substantial evidence of record.  (Tr. 28)

3. *Linda Kalatz*

The ALJ gave the opinion of Linda Kalatz, who had known Plaintiff all his life, very little weight.  (Tr. 28)  The ALJ explained that although Ms. Kalatz noted that Plaintiff has suffered severe asthma since his birth which has caused him emotional and physical problems all of his life, she provided only current examples of functional limitations.  Additionally, she opined that Plaintiff has severe depression, but did not actually note the level of his functional inabilities.  The ALJ found that her opinions were not supported by the other substantial evidence of record and could be given very little weight with regard to his functional abilities prior to December 31, 2004.  (Tr. 28)

The ALJ's conclusion that Plaintiff's parent's and Ms. Kalatz's opinions were not supported by the other substantial evidence of record is incorrect.  As previously discussed in section IV.C., above, for the same reasons the Magistrate Judge found the ALJ's second reason for rejecting Dr. Garland's opinion improper, the evidence supports Plaintiff's these opinions.

Furthermore, to the extent that the ALJ again concludes that Plaintiff's improvement of symptoms and functions on November 29, 2004, is a lasting improvement which renders Plaintiff functional and his depression "gone," Plaintiff's parent's testimony as to symptoms and functional limitations after November 31, 2004, is relevant.  To the extent the ALJ rejects Ms. Naito's opinions because she did not limit her discussion to Plaintiff's ability to function prior to December 31, 2004, her testimony is relevant in this respect as well.

1       G.      <u>Function-by-Function Assessment of Plaintiff's Residual Functional Capacity</u>

2      Because the Magistrate Judge finds that the ALJ erred at step four in evaluating the

3 opinion of Dr. Garland, Plaintiff's credibility, and the lay witness testimony, it is unnecessary

4 to reach plaintiff's further alleged errors.

5       H.      <u>Remand/Reverse</u>

6      The district court has discretion to remand for further proceedings or to award

7 benefits. *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir.1989).  Remand for an award of

8 benefits is appropriate where:

9      (1) the ALJ failed to provide legally sufficient reasons for rejecting the

10      evidence; (2) there are no outstanding issues that must be resolved before a

11      determination of disability can be made; and (3) it is clear from the record that

12      the ALJ would be required to find the claimant disabled were such evidence

13      credited.

14

15 *Benecke v. Barnhart,* 379 F.3d 587, 593, (9th Cir. 2004) (citations omitted).  Where the test

16 is met, "we will not remand solely to allow the ALJ to make specific findings...Rather we

17 take the relevant testimony to be established as true and remand for an award of benefits."

18 *Id*. (citations omitted); *see also Lester,* 81 F.3d at 834.

19      The ALJ erred in rejecting Dr. Garland's opinion, and in finding Plaintiff not credible.

20 Furthermore, the ALJ failed to provide legally sufficient reasons to give little weight to the

21 opinions of the lay witnesses.

22      Because the ALJ erred in rejecting Dr. Garland's opinion, this Court must credit the

23 evidence as true.  *See Benecke*, 379 F.3d at 594 (citations omitted).  The vocational expert

24 addressed specifically the opinion of Dr. Garland as to Plaintiff's functional limitations, and

25 testified that, taking those limitations into account, Plaintiff would not be able to perform his

26 past relevant work or any work which exists in significant numbers in our national economy.

27 (Tr. 454) Thus, crediting Dr. Garland's opinion as true would result in a finding that Plaintiff

28 would be disabled at step five of the sequential evaluation process due to his inability to

1   perform past relevant work or any other kind of work in the national economy.

2   No similar vocational opinion is available to address Plaintiff's allegations of
3   limitations or the allegations made by lay witnesses, however, no useful purpose would be
4   had in remanding the case for further administrative findings as it is clear from the record
5   that the ALJ would be required to find the claimant disabled if Dr. Garland's opinion is
6   credited.

7   Because the ALJ failed to provide legally sufficient reasons for rejecting Dr.
8   Garland's opinion, and that opinion, if credited as true establishes that Plaintiff is disabled,
9   the Magistrate Judge recommends that the District Judge reverse the decision that plaintiff
10  is not disabled, and remand for an immediate award of benefits.

11  **V.   RECOMMENDATION**

12  For the foregoing reasons, it is the recommendation of this Court that the District
13  Judge, after his independent review and consideration, enter an Order **GRANTING**
14  Plaintiff's Motion for Summary Judgment (Doc. No. 10), **DENYING** Defendant's Cross-
15  Motion for Summary Judgment (Doc. No. 18), and **REMAND** this case for an immediate
16  award of benefits.

17  Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections within
18  ten days after being served with a copy of this Report and Recommendation.  A party may
19  respond to another party's objections within ten days after being served with a copy thereof.
20  Fed.R.Civ.P. 72(b).  If objections are filed, the parties should use the following case number:
21  **CV 07-246-TUC-DCB.**

22  If objections are not timely filed, then the parties' right to *de novo* review by the
23  District Court may be deemed waived.  *See United States v. Reyna-Tapia,* 328 F.3d 1114,
24  1121 (9th Cir.) (*en banc*).

25  DATED this 30th day of May, 2008.

26
27  _____
28  Bernardo P. Velasco
    United States Magistrate Judge

- 37 -